FILED

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
DEL RIO DIVISION**

SEP **2 8** 2018

CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____
                    DEPUTY

| | |
|---|---|
| **GERARDO SERRANO,** | § |
| **Plaintiff,** | § |
| | § |
| **v.** | § |
| | § |
| **U.S. CUSTOMS AND BORDER** | § |
| **PROTECTION; UNITED STATES OF** | § |
| **AMERICA, KEVIN McALEENAN,** | § |
| **Acting Commissioner of U.S. Customs and** | § |
| **Border Protection, Sued in His Official** | § |
| **Capacity; JUAN ESPINOZA, Fines,** | § |
| **Penalties, and Forfeiture Paralegal** | § |
| **Specialist, Sued in His Individual Capacity;** | § |
| **JOHN DOE I-X, Unknown U.S. Customs** | § |
| **and Border Protection Agents, Sued in** | § |
| **their Individual Capacities,** | § |
| **JUAN ESPINOZA,** | § |
| **Defendants.** | § |

**Cause No. DR-17-CV-00048-AM**

## ORDER

Pending before the Court is the Report and Recommendation of the Honorable Collis White, United States Magistrate Judge. (ECF No. 64.)  In his report, Judge White recommends that this Court deny the Plaintiff's Motion to Certify Class (ECF No. 4); grant the Motion to Dismiss filed by Defendants United States of America, U.S. Customs and Border Protection, and Kevin McAleenan (ECF No. 49); and grant the Motion to Dismiss filed by Defendant Juan Espinoza (ECF No. 50).  The Plaintiff filed his objections to Judge White's report within the fourteen days specified in Rule 72 of the Federal Rules of Civil Procedure.  (ECF No. 65.)  The Court **OVERRULES** the Plaintiff's objections and **ADOPTS** Judge White's overall recommendations for the reasoning described herein.

## I. BACKGROUND

On September 21, 2015, the Plaintiff, a resident of Kentucky, drove his 2014 Ford F-250 truck to the United States–Mexico border through Eagle Pass, Texas, with the intent of driving to Mexico. (ECF No. 1 at 4, 6.)  After paying the toll to enter Mexico, but while still in the United States, the Plaintiff began using his cellular telephone to film activity at the border, which garnered the attention of the U.S. Customs and Border Protection (CBP) agents on duty.  (*Id.*) After a tense encounter, the agents handcuffed the Plaintiff and searched his vehicle, finding a .380 caliber magazine and five bullets in it.  (*Id.* at 7–8.)  The agents detained the Plaintiff for several hours, continuously pressuring him to reveal the passcode for his phone without success. (*Id.* at 8–10.)  They then released him, but seized his vehicle and its contents, including the magazine and the bullets.  (*Id.* at 10.)

A few days later, the Plaintiff received notice of the seizure in the mail, informing him that the truck, magazine, and bullets were seized and subject to civil forfeiture because there was probable cause to believe that the Plaintiff had attempted to export munitions of war from the United States.[1]  (*Id.* at 11; ECF No. 55-2 at 2.[2])  The Plaintiff was informed that if he wished to challenge the seizure, he could request to have the matter referred to a U.S. attorney for the institution of judicial proceedings if he posted a bond equal to ten percent of the value of the seized property. (ECF No. 1 at 11.)  The notice also informed the Plaintiff of his rights to seek

---

[1]  The parties acknowledge that it is proper for the Court to consider the notice in a motion to dismiss without converting the motion to one for summary judgment because the notice was referred to in the Complaint and it is central to the Plaintiff's claims.  *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000) ("We note, approvingly, however, that various other circuits have specifically allowed that '[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.'") (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp*, 987 F.2d 429, 431 (7th Cir. 1993)).

[2]  The notice cites to 19 U.S.C. § 1595a(d) (merchandise attempted to be exported from the United States contrary to law, and property used to facilitate the exporting, shall be seized and forfeited to the United States); 22 U.S.C. § 401 (providing for seizure and forfeiture of illegally exported war materials and vehicles used to attempt to export such articles); 22 U.S.C. § 2778 (control of arms exports and imports); and 22 C.F.R. § 127.1 (violations for illegal exports from the United States).

remission of the forfeiture, make an offer in compromise, or abandon the property.  (ECF No. 55-2 at 3–4.)

The Plaintiff timely demanded forfeiture proceedings and posted a ten-percent bond in the amount of $3,804.99.  (ECF No. 1 at 11.)  After some time, forfeiture proceedings still had not been instituted, so the Plaintiff contacted Defendant Espinoza—a CBP paralegal and the point person named in the notice—four times, asking about the status of his case.  *Id.*  Espinoza informed the Plaintiff that his paperwork was in order, but it would take time to proceed with the forfeiture action in court because the forfeiture attorneys were very busy.  (*Id.* at 11–12.)  Espinoza also allegedly told the Plaintiff that his case had not yet been referred to a U.S. attorney and would not be until an attorney had time to review it.  *Id.* at 12.

After twenty-three months of waiting, without (1) the return of his property; (2) a post-seizure hearing, or (3) the institution of a forfeiture action, the Plaintiff filed the present cause of action against the United States, seeking return of his property pursuant to Rule 41(g) of the Federal Rules of Criminal Procedure based on violations of the Fourth and Fifth Amendments. The Plaintiff argues that return of his property is proper because he was not provided with a post-seizure hearing and because the United States waited too long to institute forfeiture proceedings. (*Id.* at 20–21.)  The Plaintiff also argues that his bond money must be returned because the requirement to post a bond as a condition of obtaining a hearing violates due process.  (*Id.*)

The Plaintiff also brings two class action claims pursuant to Rule 23 of the Federal Rules of Civil Procedure, seeking class-wide injunctive and declaratory relief under the Fifth Amendment against Defendants United States of America, U.S. Customs and Border Protection, and Acting Commissioner McAleenan, in his official capacity (Class Defendants).  (*Id.* at 23.) According to the Plaintiff, after seizing vehicles, the Class Defendants fail to provide a

3

constitutionally required prompt post-seizure hearing at which a property owner can challenge the legality of the seizure and the continued retention of the property pending the forfeiture proceeding, in contravention of *Krimstock v. Kelly*, 306 F.3d 40 (2nd Cir. 2002). *(Id.)* The Plaintiff also alleges that the Class Defendants violate due process when they condition the right to a forfeiture hearing on the posting of a bond. *(Id.)* Simultaneously with his Complaint, the Plaintiff also filed his Motion to Certify the Class. (ECF No. 4.)

Finally, the Plaintiff seeks damages from Defendant Espinoza and other unknown and unserved agents acting in their individual capacities, pursuant to *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), for violations of his Fourth and Fifth Amendment rights. (ECF No. 1 at 21–23.) The Plaintiff argues that Espinoza deprived him of his constitutional right to a post-seizure hearing, and other unknown agents violated his rights by maintaining custody of his property even though no hearing was provided. *(Id.)* According to the Plaintiff, while his truck was seized, he had to rent a vehicle on multiple occasions, pay insurance on the truck, and pay title fees, all while his vehicle sat unused, continuing to depreciate in value.

The Plaintiff's truck was returned to him shortly after he filed this lawsuit; however, at the time, the bond money, magazine, or bullets still had not been returned. (ECF No. 49-1.) The Class Defendants then filed a motion to dismiss, in which they argue that the return of the Plaintiff's truck moots any cause of action under Rule 41(g). (ECF No. 49 at 4–5.) The Class Defendants also argued that due process does not require a post-seizure hearing. *(Id.* at 6.) In response the motion for class certification, the Class Defendants argue that certification is improper because the matter is now moot following the return of the Plaintiff's vehicle. (ECF No. 51.)

4

Defendant Espinoza also filed a motion to dismiss based on two grounds. (ECF No. 50.) First, Defendant Espinoza argues that the Supreme Court has never recognized a *Bivens* cause of action in the asset forfeiture context, and it would be improper to extend *Bivens* to the facts alleged here. Second, Defendant Espinoza argues that he is entitled to qualified immunity because he did not violate any clearly established constitutional right.

Subsequently, the Plaintiff's bond money, magazine, and bullets were returned. (ECF Nos. 62–63.) Thus, Plaintiff now acknowledges that his Rule 41(g) motion is moot. (ECF No. 63 at 1.) Nevertheless, the Plaintiff maintains that his class action claims and his *Bivens* actions are not moot. (*Id.* at 2.)

## II. STANDARD OF REVIEW

When a party files an objection to any portion of a magistrate judge's report and recommendation, the district court must undertake a de novo review of the conclusions to which the party properly objects. Fed. R. Civ. P. 72(b)(3) ("The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to."); 28 U.S.C. § 636(b)(1) ("A judge of the court shall make a de novo determination of those portions of the report or specified findings or recommendations to which objection is made."). In conducting a de novo review, a district court must conduct its own analysis of the applicable facts and legal standards and is not required to give any deference to the magistrate judge's findings. *See United States v. Raddatz*, 447 U.S. 667, 690 (1980) ("The phrase 'de novo determination' has an accepted meaning in the law. It means an independent determination of a controversy that accords no deference to any prior resolution of the same controversy."); *Shiimi v. Asherton Indep. Sch. Dist.*, No. 92-5562, 1993 WL 4732, at *2 n.18 (5th Cir. Jan. 8, 1993) (stating that a de novo review "means that the district court independently reviews the matters in the record").

On the other hand, the Fifth Circuit has recognized the requirement that parties filing objections must specifically identify those findings objected to, and district courts need not conduct a de novo review when the objections are frivolous, conclusive, or general in nature. *Battle v. United States Parole Commission*, 834 F.2d 419, 421 (5th Cir. 1987).

When no party files objections to a part of a magistrate judge's report and recommendation, the district court need only review that portion of the report to determine whether it is erroneous or clearly contrary to law. *Douglas v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996); *United States v. Wilson*, 864 F.2d 1219, 1221 (5th Cir. 1989). Because the Plaintiff has timely filed objections in this case, the Court will review those portions of the report to which the Plaintiff objects de novo.

Here, the Plaintiff has asserted numerous objections, thus triggering a de novo review of those factual findings and legal conclusions contained within the report.

### III. DISCUSSION

The Plaintiff objects to the report's factual findings and legal conclusions with respect to the following: (1) Judge White's analysis, but not his overall conclusion, in finding that the Plaintiff's class claims fall under the "inherently transitory" exception to class action mootness; (2) Judge White's recommendation that the Plaintiff has failed to state a claim with respect to the class defendants; (3) Judge White's recommendation that the Plaintiff's Motion for Class Certification should be dismissed; and (4) Judge White's recommendation that the Individual Defendants' Motion to Dismiss should be granted. The Plaintiff's objections are overruled.

#### A. Class Action Claims under the Fifth Amendment

Judge White first addressed the Plaintiff's class action claims brought on behalf of himself and others similarly situated. Judge White summarized the Plaintiff's class claims as

follows: (1) the Class Defendants' failure to provide a prompt post-seizure, pre-forfeiture hearing after every vehicle seizure violates the Due Process Clause of the Fifth Amendment; and (2) that the requirement of a bond in order to initiate forfeiture proceedings similarly violates due process. (ECF No. 64 at 6.)

The Plaintiff seeks to proceed on behalf of a class of all U.S. citizens, likely hundreds a year, "whose vehicles are or will be seized by CBP for civil forfeiture and held without a post-seizure hearing." (ECF No. 1 at 23.)  The Plaintiff seeks declaratory and injunctive relief, including (1) a declaration that the Class Defendants' "policy or practice of failing to provide prompt post-seizure hearings to U.S. citizens whose vehicles have been seized for civil forfeiture" is unconstitutional under the Due Process Clause of the Fifth Amendment, and (2) an injunction prohibiting Class Defendants "from continuing to seize vehicles from U.S. citizens for civil forfeiture without providing a prompt post-seizure hearing." (*Id.* at 25.)

The Class Defendants, in turn, have filed (1) a motion to dismiss these claims (ECF No. 49), and (2) a response in opposition to the motion to certify (ECF No. 51), arguing that the claims are moot because the Plaintiff's property has been returned, and, in any event, due process does not require a post-seizure hearing.

Judge White found that the Plaintiff's class-wide claim falls within the "inherently transitory" exception to class mootness despite the fact that all of his property has now been returned to him; however, Judge White nonetheless recommended that the Plaintiff's class-wide claim should be dismissed because it fails on the merits. (ECF No. 64 at 8–9, 14–23.)

*1. Inherently Transitory Exception to Mootness*

In a footnote, the Plaintiff "agrees with [Judge White's] bottom-line conclusion that the class claims are not moot," but "does object to a portion of the Report's reasoning in reaching

7

that conclusion." (ECF No. 65 at 3 n.1.) Specifically, the Plaintiff argues, the class-wide claims fell within the "inherently transitory" exception to class mootness both because (1) the claims naturally become moot whenever the seizure ends or a hearing is provided, and (2) the Government has the ability to "pick off" named plaintiffs by voluntarily returning their property. The Plaintiff argues that both the exceptions apply and objects that Judge White's report "endorses the second of these two rationales, but . . . could be read to reject the first." (*Id.*)

In *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 75–77 (2013), the Supreme Court discussed the inherently transitory exception to mootness in class actions, which in turn has its roots in *Sosna v. Iowa*, 419 U.S. 393 (1975). In *Sosna*, the Court held that a class action is not rendered moot when the named plaintiff's individual claim becomes moot *after* the class has been duly certified. 419 U.S. at 399. However, *Sosna* also suggested that, where a named plaintiff's individual claim becomes moot before the district court has an opportunity to rule on the certification motion and the issue would otherwise evade review, the certification might "relate back" to the filing of the complaint. *Id.* at 402 n.11. The Supreme Court "has since held that the relation-back doctrine may apply in Rule 23 cases where it is 'certain that other persons similarly situated' will continue to be subject to the challenged conduct and the claims raised are 'so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires.'" *Genesis Healthcare*, 569 U.S. at 76 (quoting *County of Riverside v. McLaughlin*, 500 U.S. 44, 52 (1991) (in turn quoting *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 399 (1980) (in turn citing *Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975))). The "inherently transitory" rational was developed to address circumstances in which the challenged conduct "was effectively unreviewable, because no plaintiff possessed a personal stake in the suit long enough for

8

litigation to run its course." *Genesis Healthcare*, 569 U.S. at 76. Where the transitory nature of the conduct giving rise to the suit would effectively insulate defendants' conduct from review, class certification could potentially "relate back" to the filing of the complaint. *Id.* To be sure, "this doctrine has invariably focused on the fleeting nature of the challenged conduct giving rise to the claim, not on the defendant's litigation strategy." *Id.* (internal citations omitted). Thus, for example, a plaintiff seeking to bring a class action challenging the constitutionality of temporary pretrial detentions "would face a considerable challenge of preserving his individual claim from mootness, since pretrial custody likely would end prior to the resolution of his claim." *Id.* (internal citations omitted).

In his report, Judge White explains that a previously decided Fifth Circuit decision, *Zeidman v. McDermott & Co.*, 651 F.2d 1030, 1050–51 (5th Cir. Unit A 1981), extended the *Sosna*-created concept of relation back under the inherently transitory doctrine to cases that would otherwise be rendered moot by the defendants' ability to "pick off" claims to prevent any plaintiff in the class from procuring a decision on class certification. *Id.* at 1050. Since then, the Fifth Circuit has recognized that "[t]he current status of *Zeidman* may be in doubt" in light of *Genesis Healthcare*. *See Fontenot v. McCraw*, 777 F.3d 741, 750–51 (5th Cir. 2015) (noting that the Supreme Court's rationale in *Genesis Healthcare* undermined "*Zeidman's* analogy between the 'inherently transitory' exception to mootness and the strategic 'picking off' of named plaintiff's claims."). However, in that case the Fifth Circuit ultimately declined to decide whether *Zeidman* has in fact been overruled. *Id.* Thus, Judge White found that *Zeidman* remains technically binding precedent. (ECF No. 64 at 10 n.7.)

Judge White therefore concludes that, while Plaintiff's class action claim does not present a classic inherently transitory exception to class action mootness, the present scenario "falls

squarely under *Zeidman*."[3]  (ECF No. 64 at 9.)  The Plaintiff's footnote objects to Judge White's finding that this is not a classic inherently transitory exception and, in support, refers this Court to the decisions in *Krimstock*, 306 F.3d at 70 n.34, and *Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 52 (1991).  However, both of those cases were decided prior to the Supreme Court's clarification of the inherently transitory exception doctrine in *Genesis Healthcare* and are otherwise distinguishable.

For example, in *Krimstock*, the Second Circuit noted that three of the seven named plaintiffs had recovered their property by the time of oral arguments.  306 F.3d at 70 n.34.  Accordingly, along with its decision to remand the case, the Second Circuit instructed the district court to consider whether exceptions to the mootness doctrine preserved the merits of the case for judicial resolution of the unnamed class members' claims.  *Id.* at 70.  The *Krimstock* footnote that the Plaintiff cites simply refers the district court to the inherently transitory doctrine and the possibility that "in some cases" the Supreme Court has held that the termination of a class representative's claim does not moot the claims of the unnamed members of the class.  *Id.* at 70 n.34.  The Second Circuit did not decide whether the inherently transitory doctrine actually applied under the circumstances in that case.

*McLaughlin* is also readily distinguishable.  *McLaughlin* involved a class action challenge to the manner in which the County of Riverside, California provided probable cause determinations to persons arrested without a warrant.  *McLaughlin*, 500 U.S. at 47.  Citing the inherently transitory exception, the Supreme Court held that the class claims were not mooted by

---

[3] The Plaintiff's footnote objects to Judge White's alleged suggestion that the rationale in *Alvarez v. Smith*, 558 U.S. 87, 92–93 (2009) forecloses the applicability of the classic inherently transitory doctrine to the instant case because the plaintiffs in that case had abandoned their class actions claims following the district court's denial of certification.  *See also* (ECF No. 64 at 9 ("This is not a classic inherently transitory situation under *Alvarez*.").)  The Court agrees to the extent that *Alvarez* involved analysis of the mootness of the named-plaintiffs' individual claims, not their previously abandoned class-wide claims.  However, read in context, Judge White appears to be referring to the classic inherently transitory line of cases as outlined in *Genesis Healthcare*.

the holding of probable cause determination hearings or the release of the class members. *Id.* at 51–52. Thus, the factual circumstances in *McLaughlin* appear to at least reasonably resemble the hypothetical scenario that the Supreme Court would later use to clarify the classic inherently transitory exception in *Genesis Healthcare*.

Here, the Plaintiff has not persuaded this Court that Judge White erred in his conclusion that the present scenario does not fall under the classic inherently transitory doctrine based on *Krimstock* or *McLaughlin*, particularly in light of the Supreme Court's analysis in *Genesis Healthcare*. For the classic inherently transitory exception to apply, the challenged conduct must be effectively unreviewable due its fleeting nature. The Plaintiff has failed to show that the Supreme Court's hypothetical constitutional challenge to temporary pretrial detentions in *Genesis Healthcare*, where it is *likely* that such detention will end prior to the resolution of *any* plaintiff's claim, is analogous to the claims here involving the civil forfeiture of property, especially in light of the applicable five-year statute of limitations under the customs laws in this instance. *See* 19 U.S.C. § 1621.

The Plaintiff therefore has not persuaded this Court that the proposed class claims are incapable of review due to their alleged fleeting nature as described in *Genesis Healthcare*. Accordingly, this Court overrules Plaintiff's objection to Judge White's analysis that this case does not present a classic inherent transitory exception to mootness. As outlined above, the Plaintiff does not, however, object to Judge White's conclusion that the Plaintiff's class claim nevertheless falls under *Zeidman*. Because no party has objected to that finding, this Court reviews it for clear error. As Judge White explained, the Fifth Circuit correctly called *Zeidman* into question in light of *Genesis Healthcare*, but *Zeidman* nevertheless remains binding precedent until it is expressly overruled. Thus, having reviewed Judge White's analysis,

especially in light of the Plaintiff's agreement with Judge White's conclusion, this Court overrules the Plaintiff's objections and adopts Judge White's finding that the Plaintiff's class claims fall within the inherently transitory exception under *Zeidman*.

    *2. Class Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6)*

The Plaintiff next objects to Judge White's analysis that his class allegations fail to state a claim and recommendation that the Class Defendants' Motion to Dismiss should be granted pursuant to Rule 12(b)(6). (ECF No. 65 at 3–11.) The Plaintiff argues that Judge White's conclusion is based on the following three interconnected errors: (1) Judge White's analysis disregards a series of cases holding that the Government must provide a prompt-post seizure hearing when it seizes vehicles for civil forfeiture; (2) Judge White places undue weight on the Supreme Court's decision in *United States v. Von Neumann*, 474 U.S. 242 (1986); and (3) Judge White errs in his due process analysis under *Mathews v. Eldridge*, 424 U.S. 319 (1976) by underestimating the significance of the private interest at stake and the risk of erroneous deprivation, while overstating the cost of providing a hearing.

    *a. The Plaintiff's Cited Cases do not Establish that CBP's Failure to Provide a Prompt Post-Seizure Hearing Violates Due Process*

The Plaintiff argues that Judge White's analysis errs by disregarding "numerous" federal cases holding that due process requires a prompt post-seizure hearing when the government seizes vehicles for civil forfeiture. (ECF No. 65 at 4–5 (citing *Krimstock*, 306 F.3d at 44; *Smith v. City of Chicago*, 524 F.3d 834, 838, *vacated as moot*, 558 U.S. 87 (2009); *Washington v. Marion Cty. Prosecutor*, 264 F. Supp. 3d 957, 978–79 (S.D. Ind. 2017); and *Brown v. District of Columbia*, 115 F. Supp. 3d 56, 60 (D.D.C. 2015).) The Plaintiff's objection is overruled.

Courts use the three-factor balancing test set out by the Supreme Court in *Mathews*, 424 U.S. 319, to determine what procedures are required when the government seeks to take or retain

a private interest.  The *Mathews* test weighs (1) the nature and weight of the "private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedure would entail." *Id.* at 335.

Following his review of existing precedent, Judge White found that "there is some support to the idea that a prompt post-seizure hearing is required when state, municipal, or district statutes allow for seizures for violations of law, especially where seized property is not subject to replevin." (ECF No. 64 at 18.)  However, on balance, Judge White concluded that the Plaintiff has not pointed to any case in support of the argument that a hearing is required after a seizure under federal law and, following a weighing of the *Mathews* factors, that no prompt post-seizure hearing is required under these circumstances.  (*Id.* at 18–21.)  The Plaintiff objects to Judge White's distinction between the state, municipal, or district statutes in the cases the Plaintiff cites and the federal laws at issue here.  The Plaintiff further notes that the Second Circuit's analysis in *Krimstock*—the decision on which his argument heavily relies—in turn relies on the Supreme Court's decision in *United States v. James Daniel Good Real Property*, 510 U.S. 43, 62 (1993), finding that the federal government must provide a hearing *before* it seizes *real* property.  Having reviewed the applicable case law, this Court agrees with Judge White's conclusion that the Plaintiff's citations do not sufficiently establish that a prompt post-seizure hearing is required under these circumstances when considered alongside existing precedent.

In *Krimstock*, the Second Circuit applied the *Mathews* test in a constitutional challenge to a New York law permitting police to seize vehicles following drunk driving arrests.  306 F.3d at

46. Then-Judge Sotomayor wrote that the *Mathews* factors weighed in favor of the requirement of an early opportunity to challenge the seizure and retention of their vehicles. The *Krimstock* court placed great weight in the first factor, the owner's interest in the property, because an "'individual has an important interest in the possession of his [or her] motor vehicle'" given the "particular importance" that cars have "as a mode of transportation and, for some, the means to earn a livelihood." *Id.* at 61. (citing *Lee v. Thornton*, 538 F.2d 27, 31 (2nd Cir. 1976)). The court then found that the second factor, the risk of erroneous deprivation, favored the city because "a trained police officer's assessment of the owner-driver's state of intoxication can typically be expected to be accurate." *Id.* at 62–63.

With respect to the third factor, the court found that a weighing of the government's interests favored the car owners because "the need to prevent forfeitable property from being sold or destroyed during the pendency of proceedings [did] not necessarily justify continued retention of all vehicles when other means of accomplishing those goals are available." *Id.* at 65. The court suggested that the availability of alternative measures, such as a bond, is "in some respects a superior form of security" to satisfy the government's interest. *Id.* Moreover, the court discounted the government's interest in maintaining possession of the *res* for the purposes of establishing *in rem* jurisdiction in forfeiture proceedings because the government need only maintain possession until the initiation of such proceedings. *Id.* The court also discounted the government's interest in preventing the offending *res*—the seized vehicles—from being used as instrumentalities in future acts of driving while intoxicated. *Id.* at 66. In doing so, the court reasoned that (1) the "offending *res*" is only an allegedly offending *res* inasmuch as the alleged misconduct has yet to be established in a criminal or civil proceeding; (2) while the initial seizure serves the constructive purpose of keeping an individual from driving in an inebriated condition,

that purpose loses its basis in urgency once the individual has regained sobriety; and (3) impoundment leaves the alleged offender free to drive while intoxicated in any other vehicle when the opportunity presents itself, while depriving some potentially innocent owners of the often indispensable benefits of daily access to their vehicles; and finally (4) the possibility, unique to the factual circumstances of the case, that New York only seized vehicles that might yield an attractive price at auction. *Id.* at 66–67.

Following a review of the existing precedent, this Court agrees with Judge White's conclusion that the Plaintiff has not demonstrated that *Krimstock* and its progeny dictate the outcome of this Court's own balancing of the *Mathews* factors under the factual circumstances presented in this case.  With respect to the first *Mathews* factor, Judge White agreed with *Krimstock* and *Brown* in finding that the seizure of a vehicle "unquestionably" implicates an important private interest in being able to travel and go to work.  (ECF No. 64 at 20.)  However, this Court's review indicates that other courts have readily arrived at different conclusions with respect to the *Krimstock* court's balancing of the second and third *Mathews* factors.

For example, in *United States v. One 1971 BMW 4-Door Sedan*, the Ninth Circuit found that the applicable forfeiture procedures under the federal customs laws "far better protected" vehicle owners' rights against the risk of erroneous seizure while distinguishing a prior decision involving a California state law because, under the customs laws, the U.S. Attorney had a duty to investigate and make a determination, independent of the seizing agency, as to whether forfeiture was warranted, and, in an event, the judicial hearing to which the individuals were entitled served to assure the propriety of the forfeiture.  652 F.2d 817, 820–21 (9th Cir. 1981).  The court added, "[t]he pervasive statutory scheme of which these sections are a part evidences substantial concern on the part of Congress with respect to what process is due owners of vehicles seized

under the narcotics laws. Great weight must be given to its judgment." *Id.* at 820 (citing *Mathews*, 424 U.S. at 349). Those procedures prescribed by Congress not only afforded the plaintiff the right to petition for remission of the forfeiture, but further assured him the right to judicial review of the forfeiture. *Id.* The Plaintiff here attempts to distinguish *One 1971 BMW* by arguing that the customs laws have since been amended to require additional administrative procedures for property valued at less than $500,000, which includes his vehicle. (ECF No. 65 at 6 n.2 (citing § 19 U.S.C. §§ 1607, 1610).) However, as well-documented throughout the briefing in this case, under the current customs laws applicable to the Plaintiff's property, he similarly had the option to petition for remission of the forfeiture, have his case submitted to the U.S. Attorney for an independent evaluation, and ultimately judicial review to determine whether the forfeiture was just.[4] *See One 1971 BMW*, 652 F.2d at 820 (distinguishing *Lee v. Thornton*, 538 F.2d 27 (2nd Cir. 1976)); *cf. Krimstock*, 306 F.3d at 62 (finding factor weighed in favor of government, but also stating "[n]either the arresting officer's unreviewed probable cause determination nor a court's ruling in the distant future on the merits of the City's forfeiture claim can fully protect against an erroneous deprivation . . . ."); *Brown*, 115 F. Supp. 3d at 67 ("validity of traffic stops 'rests solely on the arresting officer's unreviewed probable cause determination"). Put another way, Judge White was correct in distinguishing the Plaintiff's cited cases because the federal scheme here afforded the Plaintiff multiple alternative remedial processes that were not present in the state schemes, which lowers the risk of erroneous deprivation in this instance.

---

[4] The Court also notes that the Plaintiff's class claims argue that due process requires the creation of a prompt post-seizure hearing, not that the alleged administrative delays in referring his case to the United States Attorney in this instance or the disposition of his judicial proceedings violate due process, which would be governed by the speedy trial balancing test outlined in *Barker v. Wingo*, 407 U.S. 514 (1972).

The Second Circuit's findings in *Krimstock* with respect to the weight accorded to the third factor, the government's interests, also depart from other courts' analyses. For example, while *Krimstock* discounted the government's interest and effectiveness in preventing future acts of driving while intoxicated, the court in *One 1971 BMW* found that "[t]he interest in the appellant in the uninterrupted use of his vehicle is not so compelling as to outweigh the substantial interest of the government in controlling the narcotics trade without being hampered by costly and substantially redundant administrative burdens." 652 F.2d at 821. Likewise, the Supreme Court held in *City of Los Angeles v. David*, 538 U.S. 715, 718 (2003)—a case decided after *Krimstock* that reversed a circuit court's ruling that an additional post-seizure hearing was required—that the government's interest weighs "strongly" in the city's favor in recognition of the sheer burden that requiring prompt post-seizure hearings would place on governments. *See also United States v. $8,850 in U.S. Currency*, 461 U.S. 555 (1983) (noting that U.S. Customs processes over 50,000 noncontraband forfeitures per year); *cf. Brown*, 115 F. Supp 3d at 67 (finding third factor weighs in vehicle owners' favor where "the government has not offered any evidence regarding the potential administrative burden of providing prompt hearings with respect to automobiles . . . . "). Just as the Supreme Court recognized in *David*, Judge White did not err in acknowledging the sheer administrative burden that would fall on the government if it was required to provide prompt post-seizure hearings following every seizure.

For the reasons stated above, Judge White also correctly found that a review of existing precedent does not bind this Court, without further examination of the circumstances presented in this case, to adopt the Second Circuit's analysis of the *Mathews* factors in *Krimstock* and its progeny to find that due process requires a prompt post-seizure hearing. This Court agrees with the Plaintiff to the extent that, whether the forfeiture procedures in question arise from either

federal law, state law, municipalities, or district statutes, is not outcome determinative absent further inquiry into the particular circumstances of a particular case. However, Judge White correctly noted the distinction in the particular circumstances in cases arising under federal laws, including the availability of alternate remedial processes and the lack thereof in the cases that the Plaintiff relies on, which should be considered and weighed accordingly in this Court's balancing of the *Mathews* factors.

The Plaintiff's argument that Judge White's cited cases are themselves distinguishable is also misplaced. *See* (ECF No. 65 at 6.) *One 1971 BMW* held that the appellant was *not* entitled to an additional hearing for probable cause within 72 hours of a seizure, not that one is required as the Plaintiff suggests. *See* 652 F.2d at 820 (distinguishing *Lee*, which involved vehicles seized at remote border points that were subject to summary forfeiture and were not subject to independent review by the U.S. Attorney and final judicial determination of forfeiture). Moreover, the Plaintiff's argument that cases involving seizure of property other than vehicles "are beside the point" is unpersuasive, particularly in light of the *Krimstock* court's heavy reliance on *James Daniel Good*, which itself involved analysis of due process requirements *prior* to the seizure of real property. This Court readily agrees that existing precedent reflects that the seizure of a vehicle implicates significant private interests, which a court must take into account in its analysis and which the *Krimstock* court placed great weight in, but the significance of an owner's interest in a vehicle is not in itself determinative and must be balanced in light of the remaining factors under *Mathews*.

Accordingly, the Plaintiff's objection that Judge White errs in disregarding the Plaintiff's cited cases is overruled.

> *b. Von Neumann Does Not Govern Whether Due Process Requires a Prompt Post-Seizure Hearing*

The Plaintiff objects to Judge White's finding that *United States v. Von Neumann*, 474 U.S. 242 (1986) controls the question of whether due process requires a prompt post-seizure hearing. This Court agrees to the extent that *Von Neumann* addressed a separate question of whether an individual's interest in a car seized for a customs violation or in the money put up to secure a bond entitles him to a speedy answer to his administrative remission petition, not disposition of judicial forfeiture proceedings. The Supreme Court, while noting that "most forfeitures are disposed of through the administrative remission procedures," found that remission proceedings "supply both the Government and the claimant a way to resolve a dispute informally rather than in judicial forfeiture proceedings." *Id.* at 250. However, "remission proceedings are not *necessary* to a forfeiture determination, and therefore are not constitutionally required." *Id.* Thus, "there is no constitutional basis for a claim that respondent's interest in the car, or in the money put up to secure the bond, entitles him to a speedy answer to his remission petition." *Id.* The Supreme Court also addressed *$8,850*, which in turn applied the speedy trial test outlined in *Barker v. Wingo*, 407 U.S. 514 (1972) in finding that an eighteen-month delay in filing a customs forfeiture action did not violate constitutional due process guarantees. On the other hand, the Supreme Court's underlying rationale may have some value here where it reasoned that "[i]mplicit in this Court's discussion of timeliness in $8,850 was the view that the forfeiture proceeding, without more, provides the postseizure hearing required by due process to protect [the claimant's] property interest in the car." *Von Neumann*, 474 U.S. at 249. Thus, "[a claimant's] right to a forfeiture proceeding meeting the *Barker* test satisfies any due process right with respect to the car." *Id.* at 251.

Here, the Plaintiff strenuously argues that his class claims do not challenge a delay in initiating forfeiture proceedings, which would require analysis of the *Barker* test as applied in

*Von Neumann.*  Instead, the Plaintiff argues that he has a right to a prompt post-seizure hearing, which mandates analysis of what procedures are required under the *Mathews* test.  Stated another way, "[the Plaintiff's] claim does not concern the speed with which civil forfeiture proceedings themselves are instituted or conducted.  Instead, plaintiffs seek a prompt post-seizure opportunity to challenge the legitimacy of the city's retention of the vehicles while those proceedings are conducted."  *See Krimstock*, 306 F.3d at 68 (discussing same distinction).  This Court agrees with the Plaintiff's objection, to the extent that his class claims challenge the procedures due and not an alleged delay in the final judicial process, the proper inquiry requires application of the *Mathews* factors.[5]

To be sure, Judge White ultimately concluded that "[e]ven assuming *Von Neumann* does not provide a clear answer . . . a weighing of the *Mathews* factors firmly supports a finding that no hearing is required to satisfy due process."  (ECF No. 64 at 20 (analyzing the applicability of each *Mathews* factor in turn).)  Because Judge White correctly weighed the *Mathews* factors and found that due process does not require a prompt post-seizure hearing, if this Court agrees with that finding, the Plaintiff's objection is rendered moot.

### c.  The Plaintiff has not Demonstrated that a Prompt Post-Seizure Hearing is Required under the Mathews Factors

The Plaintiff also objects to Judge White's findings with respect to the *Mathews* factors.  Regarding the first factor, Judge White found that "[u]nquestionably the seizure of a vehicle implicates an important private interest in being able to travel and to go to work."  (ECF No. 64 at 20.)  The Plaintiff objects that Judge White "gives short shrift to the vital importance of the

---

[5]  Again, the Supreme Court's rationale with respect to the private interest in a vehicle in *$8,850* and *Von Neumann* may still add some value in balancing the *Mathews* factors.  More specifically, *Krimstock* gave great weight to an owner's private interest in a vehicle in its *Mathews* analysis while heavily analogizing vehicle seizures to the Supreme Court's analysis of an individual's right to pre-seizure notice of real property in *James Daniel Good*. *$8,850* and *Von Neumann* appear to at least contemplate on a broader level that an individual's private interest in a vehicle may not be as compelling as *Krimstock* suggests, at least in circumstances where the applicable forfeiture procedures provide for ultimate judicial determination.

interest." Upon review of the applicable law, this Court agrees with Judge White's finding that the seizure of a vehicle implicates an important private interest, and that this factor weighs in favor of the Plaintiff. Accordingly, the Plaintiff's objection is overruled.

The Plaintiff next objects to Judge White's finding that the risk of erroneous deprivation is minimal. As stated in *Krimstock*, the risk of erroneous seizure and retention of a vehicle is reduced because a trained officer's assessment of illegality can typically be expected to be accurate. 306 F.3d at 62–63 (finding that this factor weighed *against* the requirement of a prompt post-seizure hearing). Here, CBP agents are well-trained in identifying customs violations and this Court notes that, in the light most favorable to the Plaintiff, there is no dispute related to the CBP agents' assessment here that the Plaintiff's vehicle contained the magazine and bullets when he was attempting to enter Mexico. *See David*, 538 U.S. at 718 (finding minimal risk of erroneous deprivation where straightforward nature of allegations makes errors unlikely). Moreover, this Court agrees that the risk of erroneous deprivation was further minimized "by the duty of the United States Attorney immediately after notification of the seizure to investigate the facts and laws and independently to determine whether initiation of forfeiture proceedings [is] warranted." *One 1971 BMW*, 652 F2d at 821. The Plaintiff responds that his Complaint alleges that CBP does not forward cases to the U.S. Attorney in a timely fashion. However, as Plaintiff has strenuously argued, his class claims involve the issue of whether an additional prompt-post seizure hearing is required by due process, not that the delay in the carrying out the existing procedures violates due process. As discussed above, arguments regarding delay in the existing procedures would require analysis of the *Barker* factors as applied

21

in *$8,850* and *Von Neumann*.[6]   Here, Congress has provided several alternative remedial

processes under the applicable portions of the customs scheme by which the Plaintiff may correct

the erroneous deprivation of his vehicle, including the opportunity to file a petition for remission;

the U.S. Attorney's independent review; the availability of a Rule 41(g) motion, or if no criminal

action is pending, invoking this Court's general equity jurisdiction; and ultimate judicial

determination of the forfeiture.  *Id.* at 820; *see also Smith*, 524 F.3d at 837 (distinguishing *Von

Neumann* by noting that the risk of erroneous deprivation is *lessened* in forfeiture proceedings

under the customs laws because of the availability of relief under Rule 41).   Just as in *One 1971

BMW*, the availability of such alternative remedial processes under the federal scheme here

strongly suggests that Congress has already determined what process is due.   This Court

accordingly finds that the risk of erroneous deprivation is minimal.   The Plaintiff's objection is

overruled.

Finally, the Plaintiff objects to Judge White's findings with respect to the weight given to

the third *Mathews* factor, the Government's interest.   As other courts have held, this Court

cannot ignore the fact that the seizure at issue occurred pursuant to laws designed to curb illegal

activity—in this instance, the exportation of munitions of war.  *See One 1971 BMW*, 652 F2d at

821.   Seizure and forfeiture of vehicles for violations of laws foster the public interest.  *Id.* (citing

*Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 679 (1974)).   Moreover, the interest

of the Plaintiff "in the uninterrupted use of his vehicle is not so compelling as to outweigh the

substantial interest of the government in controlling [the illegal exportation of munitions]

without being hampered by costly and substantially redundant administrative burdens."  *Id.*

Additionally, after *Krimstock* was decided, the Supreme Court recognized that "administrative

---

[6] Again, to the extent that the Plaintiff challenges the timeliness in receiving process, his right to a forfeiture proceeding meeting the *Barker* test satisfies any due process right with respect to the car.  *See Von Neumann*, 474 U.S. at 251.

resources . . . are not limitless." *David*, 538 U.S. at 718. (finding that added administrative burden of providing prompt post-seizure hearings "strongly" weighs in favor of the government). The Plaintiff argues that *Washington* and *Brown* discounted the administrative burdens that could be caused by prompt post-seizure hearing for the governments in Marion County, Indiana and the District of Columbia. However, the proposed hearings in those cases were far less redundant than the proposed hearings here because those jurisdictions did not have the alternative remedial processes under federal law as outlined above in order to correct erroneous deprivations.[7]

For all of these reasons, this Court finds that the Government's substantial interest in controlling the exportation and importation of illegal contraband at the border without being hampered by costly and substantially redundant administrative burdens weighs against requiring a prompt post-seizure hearing. Thus, the Plaintiff's objection is overruled.

Because this Court finds a weighing of the *Mathews* factors indicates that due process does not require a prompt post-seizure, pre-forfeiture hearing, the Plaintiff has failed to state a claim for which relief can be granted. Accordingly, his class claims should be dismissed.[8]

## B. Motion to Certify Class Action

The Plaintiff additionally objects to Judge White's recommendation, after finding the Plaintiff's class claims be dismissed for failure to state a claim, that the Plaintiff's motion for class certification be denied because there are no remaining issues to base class certification on. For the reasons outlined above, this Court finds that the Plaintiff has failed to state a claim on behalf of the class members. No issues remain to base class certification on, and therefore, the

---

[7] The Court also remains unconvinced by the Plaintiff's proposed standard that due process requires the Government to provide such hearings where it is theoretically possible or even plausible that the Federal Government, or any other, would be able to conduct such hearings.

[8] The Plaintiff did not object to Judge White's findings with respect to the Plaintiff' class claim involving the requirement of posting a bond to institute forfeiture procedures. (ECF No. 64 at 22–23). Thus, having reviewed Judge White's findings on that issue for clear error and finding none, the Court adopts that section of Judge White's report in full.

Plaintiff's Motion to Certify Class should also be denied. Accordingly, the Plaintiff's objection is overruled.

### C. *Bivens* **Claims**

The Plaintiff next objects to Judge White's findings that (1) this case arises in a "new context" because the Supreme Court has not recognized a *Bivens* remedy under these facts and (2) that special factors advise hesitation against allowing the Plaintiff's claims to proceed. (ECF No. 65 at 13–19.) The Plaintiff's *Bivens* claims allege that Defendant Espinoza violated his Fourth and Fifth Amendment rights by processing the Plaintiff's case for civil forfeiture without providing for any post-seizure judicial process or instituting forfeiture proceedings. (ECF No. 1 at 15, 21, 22.) The Plaintiff also alleges that the unknown defendants had authority to hold or release his truck and are therefore responsible for violating his Fourth and Fifth Amendment rights because they maintained custody of his vehicle for over 23 months without judicial process. (*Id.* at 15, 21, 22–23.) The Plaintiff argues that a reasonable official in the *Bivens* Defendants' shoes would have understood that holding property for such an unreasonable period of time without a post-seizure hearing and without commencing forfeiture proceedings violates due process and constitutes an unreasonably prolonged seizure in violation of the Fourth Amendment. (*Id.* at 15–16, 21.) The Plaintiff's objections are overruled.

The Supreme Court recently clarified the reach and limits of *Bivens* claims for damages for violations of the Constitution in *Ziglar v. Abbasi. See* 137 S. Ct. 1843, 1854–65 (2017). In 1871, Congress passed a statute later codified at Rev. Stat. § 1979, 42 U.S.C. § 1983, which entitles an injured person to money damages if a state official violates his or her constitutional rights. In the 100 years leading up to *Bivens*, Congress did not provide a specific damages remedy to plaintiffs who suffered violations of their constitutional rights at the hands of agents of

the Federal Government.  Then, in 1971, the Supreme Court held in *Bivens* that, even absent statutory authorization, it would enforce a damages remedy pursuant to general principles of federal jurisdiction in order to compensate persons injured by federal officers who violated the prohibition against unreasonable search and seizures.  403 U.S. at 392, 397.  The Supreme Court has since approved an implied damages remedy under the Constitution in only two other contexts.  *See Davis v. Passman*, 442 U.S. 228 (1979) (gender discrimination claim pursuant to Fifth Amendment's Due Process Clause); *Carlson v. Green*, 446 U.S. 14 (1980) (failure to provide adequate medical treatment claim pursuant to Eighth Amendment's Cruel and Unusual Punishment Clause).

In the years that followed *Bivens*, *Davis*, and *Carlson*, the arguments for recognizing implied causes of action for damages began to lose their force, and the Supreme Court adopted a "far more cautious course before finding implied causes of action." *Ziglar*, 137 S. Ct. at 1855. Now, when a party seeks to assert an implied cause of action under the Constitution, separation-of-powers principles are central to the analysis.  *Id.* at 1857.  To be sure, the Supreme Court reiterated that *Bivens* remains well-settled law in its own context, but "expanding the *Bivens* remedy is now a 'disfavored' judicial activity[,]" and the Court has "'consistently refused to extend *Bivens* to any new context or new category of defendants.'"  *Id.* at 1855, 1857 (quoting *Iqbal*, 556 U.S. at 675; *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 68 (2001)).  The guiding principle to be considered in a *Bivens* analysis is "'who should decide' whether to provide for a damages remedy, Congress or the courts?"  *Ziglar*, 137 S. Ct. at 1857 (quoting *Bush*, 462 U.S. at 380).  "The answer most often will be Congress.  When an issue involves a host of considerations that must be weighed and appraised, it should be committed to those who

write the laws rather than those who interpret them." *Id.* (internal quotations and citations omitted).

In analyzing whether a *Bivens* remedy for damages should be extended to a particular plaintiff's claim, courts must therefore determine (1) whether the claim arises in a new context from previous *Bivens* cases decided by the Supreme Court, and if so, (2) whether special factors exist that counsel hesitation in the absence of affirmative action by Congress. *Id.* at 1859.

### 1. The Plaintiff's Bivens Claims Arise in a New Context

Judge White found that both the Plaintiff's Fourth and Fifth Amendment *Bivens* claims differ in meaningful ways from previous *Bivens* cases decided by the Supreme Court and therefore arise in a new context. The Plaintiff objects to Judge White's findings and argues that his *Bivens* claims do not arise in a new context because the Supreme Court recently reaffirmed the continued vitality of *Bivens* in the Fourth Amendment context and has "explicitly endorsed" Fifth Amendment *Bivens* claims for unreasonable delay in civil forfeiture cases. (ECF No. 65 at 13–15.)

The proper test for determining whether a case presents a new *Bivens* context is the following: "If the case is different in a meaningful way from previous cases decided by the Supreme Court, then the context is new." *Ziglar*, 137 S. Ct. at 1859. Some of the meaningful differences may include "the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider." *Id.* at 1860.

26

*a. Fourth Amendment Claim*

Here, the Plaintiff's Fourth Amendment claim bears little resemblance to the three *Bivens* claims that the Supreme Court has approved in the past, particularly in light of the Court's recent analysis in *Ziglar*. In *Ziglar*, the plaintiffs were a subset of more than 700 aliens arrested and detained on immigration charges following the September 11, 2001 terrorist attacks. *Id.* at 1852–53. Upon detention, the Federal Bureau of Investigation ("FBI") designated the aliens as either "not of interest" or "of interest" in its investigation of the terrorist attacks. *Id.* at 1852. If a detainee was designated not of interest, the alien was processed according to the normal immigration procedures. *Id.* However, if any doubt as to the proper designation existed in a particular case, the detainee was designated as "hold-until-cleared." *Id.* The plaintiffs were aliens who were subject to the hold-until-cleared policy that were detained without bail for periods ranging from three to eight months. *Id.* The hold-until-cleared detainees were housed in the Administrative Maximum Special Housing Unit of the Metropolitan Detention Center in Brooklyn, New York. *Id.* Pursuant to official Bureau of Prisons ("BOP") policy, the detainees were subjected to several harsh conditions of confinement, including being held in tiny cells for over 23 hours per day; having their lights kept on 24 hours per day; being granted little opportunity for exercise or recreation; being forbidden to keep anything in their cells, including basic hygiene products; being shackled and escorted by four guards when removed from their cells for any reason; being denied access to most forms of communication with the outside world; and being strip searched often—any time they were moved, as well as at random in their cells. *Id.* at 1853. The hold-until-cleared detainees were also allegedly subjected to harsh

27

conditions not imposed pursuant to official policy, including physical and verbal abuse from guards; being slammed into walls; having their arms, wrists, and fingers twisted; having bones broken; being referred to as terrorists; being threatened with violence; and being subjected to humiliating sexual comments and insults about their religion. *Id.* While acknowledging that in the ordinary course aliens who are present in the United States may be detained without legal authorization for some period of time, the "gravamen of [the plaintiffs' claims were] that the Government had no reason to suspect them of any connection to terrorism, and thus had no legitimate reason to hold them for so long in these harsh conditions." *Id.*

The Supreme Court found that—despite their detention for months without bail under the harsh conditions described above—the aliens' claims "bear little resemblance to the three *Bivens* claims the Court has approved in the past: a claim against FBI agents for handcuffing a man in his own home without a warrant; a claim against a Congressman for firing his female secretary; and a claim against prison officials for failure to treat an inmate's asthma." *Id.* at 1860 (citing *Bivens,* 403 U.S. at 388; *Davis*, 442 U.S. at 228; *Chappell v. Wallace*, 462 U.S. 296 (1983)).

Like Judge White, this Court agrees that the Plaintiff's Fourth Amendment claim—that the seizure of his property for over 23 months, without judicial process, violates the Fourth Amendment's prohibition on unreasonable seizures—is meaningfully different from the Supreme Court's three previous *Bivens* cases and therefore arises in a new context. While *Ziglar* reaffirmed "the continued force, or even the necessity, of *Bivens* in the search-and-seizure context in which it arose," the Supreme Court simultaneously emphasized its longstanding cautionary approach to expanding *Bivens* remedies today, such that even slight differences can indicate that a particular claim arises in a new context. *See Ziglar*, 137 S. Ct. at 1856. *Ziglar* also forecloses the Plaintiff's conclusory argument that his Fourth Amendment claim arises in

the same context as *Bivens* simply because he alleged a violation of the Fourth Amendment's prohibition against unreasonable searches and seizures.   The Supreme Court rejected such an expansive standard in finding that the appellate court erred in its analysis of (1) whether the right at issue was the same, and if so, (2) whether the mechanism of injury was the same.   *See id.* at 1859–60 (*citing Malesko*, 534 U.S. at 64 (finding different context despite almost parallel circumstances, where the right at issue and mechanism of injury were the same)).   Even using such analysis, the Plaintiff's claim here would still not pass muster, where he argues that the Fourth Amendment right at issue is the same, but has not demonstrated that the FBI's warrantless handcuffing of a man in his home in *Bivens* involves the same mechanism of injury as CBP's lawful seizure of property under 19 U.S.C. § 1595a(d) and 22 U.S.C. § 401, that according to the Plaintiff is unlawful because of the delay in receiving judicial process.

The Supreme Court's consistent refusal to expand *Bivens* remedies over the past 30 years, discussed at length in *Ziglar*, similarly forecloses the Plaintiff's reliance on decades-old circuit decisions in objecting that Judge White erred in finding that the Supreme Court has not recognized a *Bivens* remedy in the asset forfeiture context.   *See* (ECF No. 65 at 13 (citing *Seguin v. Eide*, 720 F.2d 1046, 1048 (9th Cir. 1984) (customs officials held vehicle for six months without a hearing); *States Marine Lines, Inc. v. Schultz*, 498 F.2d 1146, 1152 (4th Cir. 1974) (customs officials held cargo freight for seventeen months without a hearing)); *see also Ziglar*, 137 S. Ct. at 1857 (collecting cases)).   The Supreme Court's instructions are clear: courts must determine whether "the case is different in a meaningful way from previous *Bivens* cases decided by this Court." *Ziglar*, 137 S. Ct. at 1859–60.   Such an instruction precludes this Court from relying on cases decided by "federal courts," as Plaintiff requests, and particularly nonbinding federal court cases decided prior to the Supreme Court's clear shift to its cautionary approach to

29

expanding *Bivens* remedies. This Court also agrees with Judge White that the remaining cases that the Plaintiff cites are meaningfully different because those cases involved the unlawful seizure of property, or the continued seizure of property once the initial justification for the seizure expired and, in any event, did not arise in the asset forfeiture context. In the light most favorable to the Plaintiff, the initial justification of the seizure of his vehicle, magazine, and bullets was lawful and that justification did not expire. Such differences are meaningful enough to lead this Court to find that Plaintiff's Fourth Amendment claim arises in a new context from the Supreme Court's previously decided *Bivens* cases.

The Plaintiff additionally objects to Judge White's analysis that the true premise of his argument is that the delay in processing the forfeiture claim made the forfeiture, not the seizure, unconstitutional. *See* (ECF No. 64 at 30.) Judge White found that, while such an allegation may establish a potential Fifth Amendment violation, the Plaintiff may not simply reframe his Fifth Amendment allegation as a Fourth Amendment claim. (*Id.*) Judge White also added, on the other hand, that the distinctions present here are meaningful enough from prior Supreme Court and Fifth Circuit cases to find that Plaintiff's claims arise in a new context. (*Id.*) The Plaintiff argues that his Fourth Amendment claim cannot be dismissed simply because his Fifth Amendment rights were also allegedly violated and refers this Court to his Complaint, which alleges that the "seizure of Plaintiff's property for over twenty-three months, without judicial process, violates the Fourth Amendment's prohibition on unreasonable seizures." (ECF No. 65 at 14. (quoting ECF No. 1 ¶ 138).) This Court disagrees with Plaintiff's reading of Judge White's report to the extent that Plaintiff argues that Judge White found the Plaintiff's Fourth Amendment claim was solely precluded by the existence of his potential Fifth Amendment claim. In any event, the Plaintiff's objection is moot because this Court agrees with Judge

White's ultimate conclusion that *Bivens* allegations relating to the lawful seizure of the Plaintiff's property that allegedly became unlawful by delay in receiving judicial process differ enough from prior *Bivens* cases to support a finding that the Plaintiff's Fourth Amendment claim arises in a new context.

For the same reason, the Plaintiff's objection "to the extent that [the report suggests his] Fourth Amendment claim should fail on the merits" is overruled.  The Plaintiff is correct that the issue presently before this Court is whether his Fourth Amendment *Bivens* claim may be heard, not the underlying merits of his Fourth Amendment claim.  However, Judge White ultimately found, and this Court agrees, that the factual circumstances in this case meaningfully differ enough from the Supreme Court's prior approved *Bivens* cases to support a finding that the Plaintiff's Fourth Amendment Claim arises in a new context.  The Plaintiff's objections to Judge White's finding that his Fourth Amendment Claim arises in a new context are therefore overruled.

### b. Fifth Amendment Claim

The Plaintiff similarly objects to Judge White's finding that his Fifth Amendment *Bivens* claim arises in a new context.  The Plaintiff argues that "federal courts have allowed this type of *Bivens* claim for almost half a century, and the Supreme Court endorsed that longstanding practice in *Davis* . . . . " (ECF No. 65 at 15–16.)  The Plaintiff adds that the Supreme Court included a footnote in *Davis* citing a 1974 Fourth Circuit case that allowed a Fifth Amendment *Bivens* claim to proceed following an approximately seventeen-month cargo freight seizure by customs officials. (*Id.* at 16 (citing 442 U.S. at 244 n.22 (in turn citing *State Marine Lines*, 498F.2d at 1146))).  The Plaintiff objects that, even if a 1979 Supreme Court footnote citing a

circuit opinion not before the Court is dicta, Judge White erred because this Court is bound by both the holding and reasoning of the Supreme Court, even if it is dicta. (ECF No. 65 at 16.)

Judge White found that the Plaintiff's Fifth Amendment claim arises in a new context because the Supreme Court has not recognized a *Bivens* cause of action under the Fifth Amendment in the asset forfeiture context. (ECF No. 64 at 27.) Judge White distinguishes the Supreme Court's explicit recognition of a *Bivens* Fifth Amendment cause of action in *Davis* because it "involved gender-based employment discrimination and is wholly dissimilar to the facts here." (*Id.*) Citing *Ziglar*, Judge White then rejected the Plaintiff's argument that cases need not be identical in order to find that this case arises in the same context as previous *Bivens* claims under the Fifth Amendment. (*Id.*) According to Judge White, "[a]n equal protection claim challenging conditions of confinement has nothing in common with an asset forfeiture case, other than the fact that both claims arise under the Fifth Amendment." (*Id.*) With respect to the *Davis* footnote citing *State Marine Lines*, Judge White reasoned that a 1979 Supreme Court footnote citing a circuit opinion is dicta and hardly grounds to find the same context here. (*Id.* at 28.) Judge White also noted that *State Marine Lines* itself "is extremely outdated, called into question by *Bivens* progeny, and likely overruled." (*Id.* n.18.)

As discussed at length above with respect to the Plaintiff's *Bivens* claim under the Fourth Amendment, whether the Plaintiff's Fifth Amendment claim arises in a new context from previously approved *Bivens* cases requires analysis in light of the Supreme Court's instructions in *Ziglar*. If the case is different in a meaningful way from previous *Bivens* cases decided by the Supreme Court, then the context is new. *Ziglar*, 137 S. Ct. at 1859. "[E]ven a modest extension is still an extension." *Id.* at 1864. Here, this Court agrees with Judge White's conclusion that the Plaintiff's Fifth Amendment claim—that the *Bivens* Defendants' retention of the Plaintiff's

property without a post-seizure hearing violates the Due Process Clause—bears little resemblance to a claim against a Congressman for firing his female secretary and therefore arises in a new context. *See id.* at 1860. Again, given the clear shift in the Supreme Court's approach to recognizing implied causes of action such that expanding the *Bivens* remedy is now a "disfavored" judicial activity, and consistent refusal over the past 30 years to extend *Bivens* to any new context or new category of defendants, the Plaintiff's reliance on nonbinding circuit opinions decided shortly after *Bivens* does not persuade this Court to disregard the Supreme Court's instructions in *Ziglar*. Moreover, as discussed at length in the previous section, *Ziglar* rejects the Plaintiff's proposed expansive argument that an alleged violation of the same constitutional right requires a finding that a particular claim sufficiently arises in the same context as prior *Bivens* cases without further examination into the circumstances of a particular case. *See id.* at 1859–60. The Plaintiff's objection is therefore overruled.

Because this Court finds that the Plaintiff's *Bivens* claims under the Fourth and Fifth Amendment arise in a new *Bivens* context, a special factors analysis is required before allowing Plaintiff's claim for damages to proceed.

### 2. Special Factors Exist that Counsel Hesitation

The Plaintiff next objects that there are no special factors counseling hesitation and argues that Judge White erred in finding that the customs forfeiture laws amount to a comprehensive scheme that demonstrates Congress's reluctance to the extend the availability of monetary damages. (ECF No. 65 at 17.) The Plaintiff argues that the mere existence of a detailed statutory scheme does not preclude a *Bivens* remedy. Instead, "the statutory scheme must show that Congress made a considered decision about how best to remedy the type of violation suffered by the plaintiff." (*Id.*) The Plaintiff concludes that, because the customs

forfeiture laws are silent on what should happen if the Government unreasonably delays initiating a forfeiture action, Congress "appears not to have considered the question." (*Id.* at 17–18.) The Plaintiff also objects that Judge White's erred in considering other alternate remedies, including the possibility of filing a Rule 41(g) motion pursuant to the Federal Rules of Criminal Procedure. Finally, while agreeing that this Court has general equity jurisdiction that may be invoked in cases of delay, the Plaintiff argues that his need to invoke equity jurisdiction demonstrates the absence of a comprehensive statutory scheme. (*Id.* at 18–19.)

Judge White found that Congress has already implemented procedural protections that sufficiently function as review systems. (ECF No. 64 at 31.) Such systems, Judge White concluded, are analogous to the protection schemes that the Supreme Court previously found to preclude implied *Bivens* remedies in *Schweiker* and *Bush*. *See Schweiker v. Chilicky*, 487 U.S. 412, 423 (1988) (person seeking disability benefits can pursue various levels of recourse after an initial determination of eligibility, including review by a federal ALJ; a hearing before the Appeals Council; and judicial review); *Bush v. Lucas*, 462 U.S. 367 (1983) (First Amendment suit against federal employer, where there existed comprehensive procedural and substantive provisions for civil service remedies). Judge White further reasoned that the absence of a statutory provision allowing for monetary damages against either the United States or an officer in his or her individual capacity indicates Congress's reluctance to extend the availability of monetary damages against individual officers. (ECF No. 64 at 31–32 (citing *Schweiker*, 487 U.S. at 424).) Additionally, Judge White found that recognizing a cause of action would have significant consequences on the federal government and its employees, and that Congress is in a far better position than a court to evaluate the impact of a new species of litigation. Finally, Judge White found that there is nothing unconstitutional about the forfeiture scheme itself, and in

any event, *Schweiker* made it clear that courts must look to the comprehensiveness of the statutory scheme involved, not the adequacy of specific remedies extended thereunder. (*Id.* at 33.)

A *Bivens* remedy will not be extended to new contexts where there are "special factors counselling hesitation in the absence of affirmative action by Congress." *Ziglar*, 137 S. Ct. at 1857–58 (internal citations and quotations omitted). The Supreme Court has not defined the phrase "special factors counseling hesitation[,]" however, "the inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id.* Thus, a special factor counseling hesitation must cause a court to hesitate before answering that question in the affirmative. *Id.* "The decision to recognize a damages remedy requires an assessment of its impact on governmental operations system-wide. Those matters include the burdens on Government employees who are sued personally, as well as the projected costs and consequences to the Government itself when the tort and monetary liability mechanisms of the legal system are used to bring about the proper formulation and implementation of public policies." *Id.* at 1858.

Importantly, courts defer to indications that congressional inaction has not been inadvertent. *Schweiker*, 487 U.S. at 423. Courts also have not created additional *Bivens* remedies "[w]hen the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration." *Id.* "If the statute does not display an intent to create a private remedy, then a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Ziglar*, 137 S. Ct.. at 1856. Likewise, the "absence of statutory relief for a constitutional violation . . . does not

by any means necessarily imply that courts should award money damages against the officers responsible for the violation." *Schweiker*, 487 U.S. at 421–22. Even where existing remedies do not provide "complete relief" for a plaintiff, the Supreme Court has refused to create a *Bivens* action. *Id.* at 423 (internal citations omitted).

Here, having considered the special factors necessarily implicated by the Plaintiff's Fourth and Fifth Amendment claims, this Court finds that those factors demonstrate that Congress should decide whether a damages actions should be allowed, not the courts. At the outset, this Court agrees with Judge White's finding that the forfeiture system in place cannot reasonably be distinguished from the review systems in *Bush* and *Schweiker*. Just as in *Bush* and *Schweiker*, Congress has failed to provide for "complete relief" to the extent that the Plaintiff has not been given a remedy in damages for allegedly unreasonable delays in receiving judicial process following the seizure of his property. Therefore, the creation of a *Bivens* remedy would obviously offer the prospect of relief for alleged injuries that must now go unredressed. However, even assuming arguendo Plaintiff's allegation that the seizure of his property for 23 months was in fact unreasonable, despite the five-year statute of limitations under 19 U.S.C. § 1621, Congress still has not failed to provide meaningful safeguards or remedies for the rights of persons situated as the Plaintiff was here.

After CBP officers seized the Plaintiff's vehicle, bullets, and magazine pursuant to 19 U.S.C. § 1595a(d) and 22 U.S.C. § 401, the Plaintiff had several alternatives under the existing scheme that served as sufficient safeguards available to him in order to remedy the alleged wrongful seizure of his property. Indeed, on October 1, 2015, CBP issued the Plaintiff a Non-CAFRA Notice of Seizure and Information to Claimants outlining those several alternatives available to him, including (1) filing an administrative petition for remission under 19 U.S.C. §

1618; (2) submitting an offer of compromise under 19 U.S.C. § 1617; (3) abandoning the property; or (4) requesting a referral to the United States Attorney's Office for the institution of judicial forfeiture proceedings. *See* (ECF No. 50-2.)[9]  Additionally, this Court notes the Plaintiff's actual filing of a Rule 41(g) motion in this case, regardless of its merits, prompted CBP to return his property.  Moreover, the Plaintiff concedes that invoking this Court's general equity jurisdiction was an alternative available to him at any point during the alleged delay. (ECF No. 65 at 18–19.)

The existence of the administrative scheme here, combined with the Plaintiff's option to file a Rule 41(g) motion or invoke this Court's general equity jurisdiction, strongly suggests that there exists alternate remedial processes available to the Plaintiff for the type of violation that he allegedly suffered.  The existence of such alternate remedial processes in this case is sufficient to deny the Plaintiff an additional *Bivens* remedy.  *See Ziglar*, 137 S. Ct. at 1858.  These alternate remedial processes available to the Plaintiff also strongly suggest that this is not a case of "damages or nothing" as the he argues, and the Court again notes that the Plaintiff's actual utilization of one available method in this case resulted in the return of his property.  *See Ziglar*, 137 S. Ct. at 1862.

Additionally, *Schweiker* forecloses the Plaintiff's argument that the forfeiture laws do not amount to a comprehensive statutory scheme because they do not specifically address the question of what should happen if the Government unreasonably delays initiating a forfeiture

---

[9]  The Plaintiff appears not to have opted to take advantage of at least one of the administrative remedies available to him that most similarly situated people utilize. *See Von Neumann*, 474 U.S. at 250 (observing that most forfeitures are resolved through petitions for remission).  Therefore, while the Plaintiff's claims relate to unreasonable delay in receiving judicial process through the current scheme, the Court does note that he declined to exercise his option to directly and immediately petition CBP for administrative remission in addition to seeking referral to the U.S. Attorney for judicial action during the time his property was seized.  Even in the event that the Plaintiff was dissatisfied with the decision on that hypothetical petition for remission, he then would have been granted an additional 60 days to request to have his case reviewed by the U.S. Attorney's office for judicial action. (ECF No. 50-2 at 2.)  At any time, the Plaintiff also could have, and did, file a Rule 41(g) motion or invoke this Court's general equity jurisdiction.

action. *See Schweiker*, 487 U.S. at 427–28 ("Here, as in *Bush*, it is evident that if we were to fashion an adequate remedy for every wrong that can be proved in a case . . . [the complaining party] would obviously prevail. . . . In neither case, however, does the presence of alleged unconstitutional conduct that is not *separately* remedied under the statutory scheme imply that the statute has provided 'no remedy' for the constitutional wrong at issue.") (internal quotations and citations omitted).   For the same reason, this Court is unpersuaded by the Plaintiff's argument, without citing authority, that the statutory scheme must affirmatively demonstrate that Congress made a considered decision about how best to remedy the specific type of violation suffered by the Plaintiff in order to preclude a *Bivens* remedy.   In fact, it is equally reasonable here to conclude that "Congress' failure to provide a damages remedy might be more than mere oversight, and that congressional silence might be more than 'inadvertent.'" *Ziglar*, 137 S. Ct. at 1862 (citing *Schweiker*, 487 U.S. at 423).   Put another way, and just like in *Ziglar*, the silence of Congress here is relevant, and it is telling. *Id.*   Congressional interest in the customs laws has been frequent and intense.   Congressional interest specifically in asset forfeitures has been demonstrated by Congress's enactment of the Civil Asset Forfeiture Reform Act of 2000 (CAFRA).   That legislation's exemption from the processing timeline contained therein of the forfeiture proceedings, under 19 U.S.C. § 1595a and 22 U.S.C. § 401, sufficiently causes this Court to hesitate before creating a *Bivens* remedy in these circumstances. *See* 18 U.S.C. § 983(i).   Congress has, however, provided for a five-year statute of limitations under these circumstances, and this Court further hesitates to create a *Bivens* remedy where the Plaintiff's claim concludes that 23 months is unreasonable, despite the applicable statute of limitation. *See* 19 U.S.C. § 1621.

Additional special factors are present that make this Court hesitate to conclude that the Judiciary is well-suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed. For example, this Court agrees with Judge White's finding that recognizing a cause of action here would also have significant consequences on the federal government and its employees. (ECF No. 64 at 32.) The risk of personal damages liability is more likely to cause an employee to second guess difficult but necessary decisions concerning seizures under the customs laws. *See Ziglar*, 137 S. Ct. at 1862. Recognizing a new *Bivens* remedy here would therefore weaken the strong governmental interest in halting criminal organizations' exportation of fruits of criminal enterprises into Mexico because border agents may hesitate before acting for fear of personal liability. *See De La Paz v. Coy*, 786 F. 3d 367, 379 (5th Cir. 2015) (declining to recognize a *Bivens* remedy in part because "[f]aced with a threat to his checkbook from suits based on evolving and uncertain law, the officer may too readily shirk his duty"). Moreover, creating a new remedy would impair the Executive Branch's power to control the borders and promote our relationship with Mexico by stemming the flow of arms into Mexico. *Id.* at 379 (finding Executive Branch has "'inherent power as sovereign to control and conduct relations with foreign nations.'") (internal citations omitted). Additionally, seizing money and property from criminals allows law enforcement to preserve evidence throughout its investigation and establish *in rem* jurisdiction during subsequent forfeiture proceedings.

The special factors outlined above are sufficient enough for this Court to find that whether a *Bivens* action for damages should be allowed is a decision for Congress to make. Congress is in a better position than the courts to decide whether the creation of a new substantive legal liability here would serve the public interest. *Schweiker*, 487 U.S. at 426–27;

*Bush*, 462 U.S. at 390.  Whether or not we believe that Congress's response in this case was the best response, Congress is the body charged with making the inevitable compromises required in the design of a massive and complex asset forfeiture scheme under the customs laws.  *Schweiker*, 487 U.S. at 429 (citation omitted).  In summary, this Court finds that the Plaintiff's Fourth and Fifth Amendment *Bivens* claims arise in a new context from previously decided Supreme Court cases and special factors counsel against expanding *Bivens* here.  The Plaintiff's objections with respect to his Fourth and Fifth Amendment *Bivens* claims are therefore overruled.

## IV. CONCLUSION

Having reviewed the record and law in this case, this Court now **ORDERS** the following:

1. The Plaintiff's Motion for Class Certification (ECF No. 4) is **DENIED AS MOOT**.

2. The Motion to Dismiss by Defendants United States Customs and Border Protection, United States of America, and Kevin McAleenan (ECF No. 49) is **GRANTED**, the Rule 41(g) Motion is **DISMISSED AS MOOT**, and the class claims against them is **DISMISSED WITH PREJUDICE** to refiling by the above-named Plaintiff, but without prejudice as to any other potential plaintiffs.

3. Defendant Espinoza's Motion to Dismiss (ECF No. 50) is **GRANTED** and the claims against him are **DISMISSED WITH PREJUDICE**.

4. Finally, the claims against the unknown defendants are **DISMISSED WITHOUT PREJUDICE**.  Assuming the Plaintiff could identify any of the unknown defendants at a later time, amendment of the Complaint pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure to name the specific agents would be futile, since a *Bivens* claim against them would have no merit.  Courts, however, lack personal jurisdiction over unidentified fictitious defendants.  *See Cunningham v. Advanta Corp.*, 2009 WL

10704752, at *3 (N.D. Tex. Feb. 6, 2009); *Taylor v. Fed. Home Loan Bank Bd.*, 661 F. Supp. 1341, 1350 (N.D. Tex. 1986). Therefore, the claims should be dismissed *without prejudice*, pursuant to Federal Rule of Civil Procedure 12(b)(2).   *See Int'l Energy Ventures Mgmt., L.L.C. v. United Energy Grp., Ltd.*, 818 F.3d 193, 213(5th Cir. 2016) (dismissal for lack of personal jurisdiction must be without prejudice).

It is so **ORDERED**.

SIGNED and ENTERED on this 28th day of September, 2018.



ALIA MOSES
United States District Judge

41